FILED
OCT 13 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| TERRI BRUCE, <br><br> *Plaintiff*, <br> v. <br><br> STATE OF SOUTH DAKOTA and LAURIE GILL, in her official capacity as Commissioner of the South Dakota Bureau of Human Resources, <br><br> *Defendants*. | Case No. 17-5080 |

# COMPLAINT

1. The State of South Dakota provides healthcare coverage to State employees through the South Dakota State Employee Health Plan ("SDSEHP" or the "Plan"). Under the Plan, all State employees are "entitled to Medically Necessary services and supplies, if provided by or under the direction of a Physician." The Plan defines "Medically Necessary" as "Health care services or supplies needed to prevent, diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine."

2. Despite the broad healthcare coverage provided to every other employee, the Plan singles out transgender employees for unequal treatment by categorically depriving them of all medical care for gender dysphoria, regardless of whether those treatments are medically necessary under accepted standards of care.

3. Plaintiff Terri Bruce is a man who is transgender. He has worked at the South Dakota State Historical Society Archaeological Research Center as a temporary employee since 2005 and a permanent employee since 2010.

4. As a result of the Plan's discriminatory exclusion, Mr. Bruce has been blocked from receiving medically necessary chest reconstruction surgery prescribed by his physician in accordance with the widely accepted standards of care for treating gender dysphoria. According to the Plan administrator, "while [the surgery] may be medically necessary" the Plan "specifically excludes coverage for Services (sic) or drugs related to gender transformations."

5. As a result of the Plan's discriminatory exclusion, Mr. Bruce has been forced to pay out of pocket for medically necessary hormone therapy prescribed by his physician in accordance with the widely accepted standards of care for treating gender dysphoria.

6. The SDSEHP provides coverage for the same types of chest reconstruction surgery and hormones when prescribed as medically necessary treatment for other medical conditions. But the Plan categorically excludes coverage for these same treatments when they are medically necessary to treat gender dysphoria.

7. The Plan's discriminatory exclusion subjects Mr. Bruce—as an employee who is transgender—to unequal treatment and denies him a valuable employee benefit that is provided to every other State employee.

8. There is no legitimate medical justification for the Plan's discriminatory exclusion. In the past, some public and private insurance companies excluded coverage for treatment of gender dysphoria (or "transition-related care") based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, every major medical organization recognizes that such exclusions have no basis in medical science and that transition-related care is effective, safe, and medically necessary for treatment of gender dysphoria.

9. The Plan's discriminatory exclusion lacks any rational basis and is grounded in sex stereotypes, discomfort with gender nonconformity, and moral disapproval of people who are transgender.

10. On its face and as applied to Mr. Bruce, the Plan discriminates against employees because of sex in violation of the Title VII of the Civil Rights Act of 1964 and deprives transgender employees of equal treatment under the Equal Protection Clause of the Fourteenth Amendment. Mr. Bruce brings this Complaint for declaratory and injunctive relief.

## JURISDICTION

11. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Constitution of the United States, and 42 U.S.C. § 1983.

12. This Court has jurisdiction pursuant to Article III of the United States Constitution; 28 U.S.C. §§ 1331, 1343; and 42 U.S.C. § 2000e-5(f)(3).

13. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14. Plaintiff Terri Bruce resides in the Western Division of the District of South Dakota.

15. Mr. Bruce is a South Dakota State employee working at the South Dakota State Historical Society Archaeological Research Center in Rapid City, South Dakota

16. Defendant Laurie Gill is sued in her official capacity as Commissioner of the South Dakota Bureau of Human Resources located in Pierre, South Dakota. The Bureau of Human Resources is the State agency responsible for designing and administering the SDSEHP, including the administration and payment of claims.

## VENUE

17. Venue lies with this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice was committed at Mr. Bruce's place of employment in this District, in Rapid City, South Dakota.

18. Venue also lies with this Court pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, in Rapid City, South Dakota.

## EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS

19. On June 30, 2016, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission against the State of South Dakota for sex discrimination in violation of Title VII.

20. On June 21, 2017, the EEOC issued a determination finding reasonable cause to believe that South Dakota discriminates against Mr. Bruce on the basis of sex in violation of Title VII. (Exhibit A.)

21. On July 17, 2017, the EEOC issued a right-to-sue letter to Plaintiff. (Exhibit B.)

## FACTUAL ALLEGATIONS

### Transgender individuals and gender dysphoria

22. "Gender identity" is a well-established medical concept, referring to one's sense of oneself as belonging to a particular gender. Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the sense of one's self—one's gender identity—differs from the sex assigned to them at birth.

23. Transgender men are men who were assigned "female" at birth, but have a male gender identity. Transgender women are women who were assigned "male" at birth, but have a female gender identity.

24. Experts agree that gender identity has a biological component, meaning that each person's gender identity (transgender and non-transgender individuals alike) is the result of biological factors, and not just social, cultural, and behavioral ones.

25. Regardless of the precise origins of a person's gender identity, there is a medical consensus that gender identity is deep-seated, set early in life, and impervious to external influences.

26. Gender dysphoria is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex.

27. Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-10). The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).

28. The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by the leading medical organizations, including the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics.

29. Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another. This treatment, often referred to as transition-related care, may include

hormone therapy, surgery (sometimes called "sex reassignment surgery" or "gender confirmation surgery"), and other medical services that align individuals' bodies with their gender identities. The exact medical treatment varies based on the individualized needs of the person.

30. According to every major medical organization and the overwhelming consensus among medical experts, the protocol for treating gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria.

31. In the past, public and private insurance companies excluded coverage for transition-related care based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, the medical consensus is that exclusions of transition-related healthcare have no basis in medical science.

32. For example, in 2008 the American Medical Association ("AMA") passed Resolution 122 recognizing gender dysphoria (then known as Gender Identity Disorder, or GID) as a "serious medical condition" which, "if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death." AMA, Resolution 122, *Removing Financial Barriers to Care for Transgender Patients* (June 16, 2008). The AMA emphatically asserts that "[h]ealth experts in GID, including [WPATH], have rejected the myth that such treatments are 'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and effective treatment for a serious health condition." *Id.*

33. In Resolution 122, the AMA also opposes categorical exclusions of coverage for treatment of gender dysphoria when prescribed by a physician, noting that "many of these same treatments ... are often covered for other medical conditions" and that "the denial of these

otherwise covered benefits for patients suffering from GID represents discrimination based solely on a patient's gender identity." *Id.*

34. The American Psychiatric Association, the American Psychological Association, and the Endocrine Society have all issued similar resolutions.

35. Applying contemporary standards of care, Medicare, state Medicaid programs, and private insurers routinely cover transition-related surgery as medically necessary treatment for gender dysphoria.

### SDSEHP and its exclusion of coverage for "gender transformation"

36. Mr. Bruce's healthcare coverage is provided and paid for by the State of South Dakota through the South Dakota State Employee Health Plan.

37. The Bureau of Human Resources is the State agency responsible for designing and administering the Plan, including the administration and payment of claims.

38. The managed care review company contracted to review claims under SDSEHP is Health Management Partners.

39. In general, the Plan states that "[m]embers shall be entitled to Medically Necessary services and supplies, if provided by or under the direction of a Physician." The Plan defines "Medically Necessary" as "Health care services or supplies needed to prevent, diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine."

40. Despite this general provision, the Plan categorically excludes all "[s]ervices or drugs related to gender transformations" regardless of medical necessity.

### Mr. Bruce's medically necessary treatment for gender dysphoria

41.     Terri Bruce has worked at the South Dakota State Historical Society Archaeological Research Center since 2008.

42.     Mr. Bruce is a man who is transgender. Since 2012, he has been identified as a male on insurance forms. On October 15, 2015, his passport was changed to identify him as male. On December 3, 2015, a South Dakota state court issued an order declaring that his gender is male and directing the South Dakota State Register to issue him a birth certificate reflecting that he is male.

43.     Since 2011, Mr. Bruce has been receiving hormone therapy prescribed by his physician as part of his medically necessary treatment for gender dysphoria in accordance with the WPATH Standards of Care. Because of SDSEHP's categorical exclusion of services related to gender transformation, he has been paying for the necessary hormones out of pocket at a cost of approximately $120 - $200 per year.

44.     On May 3, 2016, Mr. Bruce visited Dr. Mary Snyder of Black Hills Plastic Surgery, to whom he was referred by his primary care physician, and a mastectomy gynecomastia was scheduled for June 22, 2016 as part of his medically necessary treatment for gender dysphoria.

45.     On May 9, 2016, HMP denied preauthorization, stating that "while it may be medically necessary" [the employee health plan] "specifically excludes coverage for Services (sic) or drugs related to gender transformations." May 9, 2016 Denial Letter (attached as Exhibit D).

46.     After Mr. Bruce filed a first-level appeal, the State of South Dakota [Employee Benefits Program] upheld the denial because of the categorical exclusion in the state health plan

for "[s]ervices or drugs related to gender transformations." May 26, 2016 Letter (attached as Exhibit D).

47. At one point during the process of seeking coverage for his mastectomy gynecomastia Mr. Bruce spoke to Deb [last name unknown] from Health Management Partners. She told him that if he had been assigned male at birth and were experiencing clinically significant psychological distress from the size of his breasts, the Plan would cover the mastectomy gynecomastia as medically necessary. But because he is a man who is transgender, the procedure is excluded from coverage regardless of how medically necessary it is.

## LEGAL CLAIMS

### COUNT I
### (Against South Dakota)

### VIOLATION OF TITLE VII

48. Title VII of the Civil Rights Act of 1964 provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

49. The State of South Dakota is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e-(a) and (b).

50. An employer-sponsored health plan is part of the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

51. Discrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of "sex" under Title VII.

52. By categorically excluding coverage for all medically necessary "transgender services" or services related to "gender transformation," the State of South Dakota has drawn a classification that discriminates based on transgender status and gender nonconformity.

53. As a result of the exclusion in the Plan, non-transgender employees receive coverage for all their medically necessary healthcare, but transgender employees do not.

54. Because medical transition from one sex to another inherently violates gender stereotypes, denying medically necessary coverage for such healthcare constitutes impermissible discrimination based on gender nonconformity.

55. The State of South Dakota's exclusion of medically necessary care for gender dysphoria is not based on standards of medical care; it is based on moral disapproval of, and discomfort with, transgender people and gender transition.

56. By excluding all healthcare related to "gender transformation" from the only available health plan it provides to employees, the State of South Dakota has unlawfully discriminated—and continues to unlawfully discriminate—on the basis of sex in violation of Title VII.

**COUNT II**
**(Against Defendant Gill in her official capacity))**

**VIOLATION OF THE EQUAL PROTECTION CLAUSE**

57. Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

58. At all relevant times, Defendants have acted under color of state law.

59. The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." State employees are protected by the Equal Protection Clause.

60. By categorically excluding all medically necessary "transgender services" or services related to "gender transformation" the State of South Dakota has unlawfully

discriminated—and continues to unlawfully discriminate—against Mr. Bruce on the basis of gender, which is subject to heightened scrutiny under the Equal Protection Clause.

61. By excluding all healthcare related to "gender transformation" from the only available health plan it provides to employees, the State of South Dakota has unlawfully discriminated—and continues to unlawfully discriminate—on the basis of transgender status, which is independently subject to heightened scrutiny under the Equal Protection Clause.

   a. Men and women who are transgender, as a class, have historically been subject to discrimination.

   b. Men and women who are transgender, as a class, have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society.

   c. Men and women who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

   d. Men and women who are transgender, as a class, are a minority with relatively little political power.

62. The Plan's discriminatory exclusion is not narrowly tailored to serve a compelling governmental interest.

63. The Plan's discriminatory exclusion is not substantially related to an important governmental interest.

64. The Plan's discriminatory exclusion lacks any rational basis and is grounded in sex stereotypes, discomfort with gender nonconformity, and moral disapproval of people who are transgender.

## RELIEF REQUESTED

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. Declaratory relief, including but not limited to a declaration that Defendant State of South Dakota violated Title VII and Defendant Gill, in her official capacity, violated the Equal Protection Clause;

B. Injunctive relief with respect to both Defendants;

C. Compensatory, consequential, and punitive damages with respect to Defendant South Dakota in an amount to be determined at trial for violation of Title VII;

D. Pre-judgment and post-judgment interest;

E. Plaintiff's reasonable costs and attorneys' fees pursuant to Title VII and 42 U.S.C. § 1988; and

F. Such other relief as the Court deems just and proper.

Dated: October 13, 2017

/s/ James D. Leach
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Phone: (605) 341-4400
jim@southdakotajustice.com

Joshua A. Block
Leslie Cooper
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
jblock@aclu.org
lcooper@aclu.org
*Pro hac vice applications to be submitted*

Courtney Bowie
American Civil Liberties Union

—12—


of South Dakota
P.O. Box 1170
Sioux Falls, SD 57101
Tel.: 201-284-9500
e-mail: cbowie@aclu.org
*Pro hac vice application to be submitted*