# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| TERRI BRUCE, <br><br> *Plaintiff,* <br><br> v. <br><br> STATE OF SOUTH DAKOTA and LAURIE GILL, in her official capacity as Commissioner of the South Dakota Bureau of Human Resources <br><br> *Defendants.* | Case No. 17-5080 |

## REBUTTAL EXPERT DISCLOSURE REPORT OF
## GEORGE RICHARD BROWN, MD, DFAPA

I, George R. Brown, have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

1. On March 18, 2018, I signed an expert report setting forth my opinion on: (1) the medical condition known as gender dysphoria; (2) the prevailing treatment protocols for gender dysphoria; and (3) whether there is a legitimate medical basis for exclusion (ww) in the South Dakota State Employee Health Plan for Fiscal Year 2015 ("SDSEHP" or the "Plan") at page 56, which categorically excludes coverage for "[s]ervices or drugs related to gender transformations."

2. As noted in my initial report, SDSEHP at page 11 defines "Medically Necessary" as "Health care services or supplies needed to prevent, diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine." I explained in my initial report that there is no dispute in the mainstream medical community that transition-

1

related care, including hormone therapy and surgery, treats an "illness" or "condition," and that such care "meet[s] accepted standards of medicine."

3. I filed a supplemental report on April 8, 2018, based on Defendants' Answer to Plaintiff's First Set of Interrogatories

4. I now provide this rebuttal report in response to the Defendants' Expert Declaration from Paul W. Dr. Hruz, dated May 21, 2018, and Defendants' Expert Declaration of Daniel Dr. Sutphin, dated May 28, 2018.

5. I have knowledge of the matters stated in this report and have collected and cited to relevant literature concerning the issues that arise in this litigation.

6. I may further supplement these opinions in response to information produced by Defendants in discovery.

**Dr. Hruz and Dr. Sutphin have no expertise or experience treating gender dysphoria**

During my three decades treating and researching the subject of the diagnosis and treatment of gender dysphoria, I have kept up with published research, and I have consistently been deeply engaged with the community of experts in this field (including endocrinologists and plastic surgeons) through conferences, consultations, lecturing, and other professional activities. I have consistently contributed publications appearing in peer reviewed journals and books on this specific topic as well. Neither Dr. Hruz nor Dr. Sutphin is a contributor to the peer-reviewed literature in this area or someone who presents or participates in professional conferences on gender dysphoria. hh

7. Dr. Hruz and Dr. Sutphin also have no clinical experience treating gender dysphoria. Dr. Hruz is a pediatric endocrinologist who has never treated a patient for gender dysphoria and refuses to do so. Hruz Report ¶ 8. Dr. Sutphin is a plastic surgeon who states he

2

has provided care to "heterosexual, homosexual, bisexual and transsexual patients of multiple racial and religious backgrounds" but does not report having any experience providing surgical care for gender dysphoria. Sutphin Report ¶ 1.

**Dr. Hruz and Dr. Sutphin's views depart from accepted standards of care**

8. Dr. Hruz and Dr. Sutphin disagree with the medical consensus regarding the necessity of hormone therapy and/or surgeries to treat gender dysphoria, which has been recognized by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, and every other mainstream medical organization that has spoken on the issue. Dr. Hruz and Dr. Sutphin have not identified any mainstream medical organization supporting their own view that transition-related care does *not* meet accepted standards.

9. Dr. Hruz is a member of the American Academy of Pediatrics, the Pediatric Endocrine Society, and the Endocrine Society, which all have explicitly endorsed the medical necessity of transition-related care for patients diagnosed with gender dysphoria. And the department where Dr. Hruz works—the Division of Pediatric Endocrinology at Washington University's St. Louis Children's Hospital—rejects his views regarding gender dysphoria and provides transition-related care (see http://www.stlouischildrens.org/our-services/transgender-center/meet-the-team, which describes the hormonal care provided by pediatric endocrinologists in his department).

10. As discussed in my previous declarations, the assertions made in Defendants' response to Plaintiff's First Interrogatory represent a fringe viewpoint that falls far outside the mainstream of medical consensus. Although Dr. Hruz and Dr. Sutphin attempt to rebut that assertion by citing to articles and statements in which providers of transition-related care

3

recognize areas for future study, none of those authors suggest that transition-related care is therefore not medically necessary.

11. In fact, Dr. Hruz provided a reference to one of my own coauthored publications (Feldman J, Brown G, et al: Priorities for transgender medical and mental health care research. Current Opinion in Endocrinology, Diabetes, and Obesity, February 2016 DOI: 10.1097/MED.0000000000000229).  Hruz Report ¶¶ 32, 40. My coauthors and I point out gaps in research knowledge that currently exist—just as researchers do in most fields of medicine—and we call for collaborative efforts to continue research to improve upon the knowledge base.

12. The literature on medical conditions is often full of gaps (witness the recent controversy on whether women who have had mastectomy should or should not receive chemotherapy afterwards and the ever-changing recommendations on cholesterol management and prostate screening/treatment recommendations). Such gaps do not paralyze a physician's treatment efforts when faced with human suffering from well-established diagnoses. Physicians collaboratively work with their patients, discuss available treatments, present the limitations in knowledge at that point in time, and provide the care that has the best known chance to help that patient.  For almost all medical conditions, we hope to have more and better data as time progresses.

13. Dr. Hruz and Dr. Sutphin hold research and clinical practice regarding gender dysphoria treatment to an impossible standard that is inconsistent with the accepted standards of care the medical community applies to other medical conditions. As discussed in my previous report, for most surgeries—including surgical care for gender dysphoria—it is impossible to conduct "double blind" studies with sham surgeries or placebos.  Having designed and implemented clinical trials myself, I can say without doubt that a placebo-controlled and/or

blinded trial of medical and/or surgical treatments for gender dysphoria is not technically possible or ethically feasible.

14. The level of evidence supporting accepted clinical guidance for gender dysphoria is the same type of evidence relied upon by the medical community to treat countless other medical conditions. Studies demonstrating that patients' conditions improved after treatment can be very informative, whether or not there are matched control groups. (Manieri, Castellano, Crespi, et al., 2014). Moreover, there is abundant clinical experience going back 50 years establishing the effectiveness of hormone therapy and surgeries as treatment for gender dysphoria in adults following accepted standards of care.

15. Dr. Hruz nevertheless argues for "randomized controlled trials comparing outcomes of hormone and surgical intervention with other treatment modalities including psychological support." Hruz Report ¶ 42. Dr. Hruz does not explain what he means by "psychological support," but it is apparently different from what he describes as a "gender affirming model" and seems to suggest that with proper counseling transgender individuals would "experience spontaneous realignment of gender identity with biological sex." Hruz Report ¶ 42.

16. Dr. Hruz has no expert qualifications for hypothesizing about the efficacy of treating gender dysphoria with only "psychological support." The only evidence he points to is research involving pre-pubertal children—not adults. As explained in my previous report, there is no support in the medical literature for the notion that gender dysphoria in post-pubertal adolescents or adults will resolve itself without medical intervention. In my personal experience of 35 years of work, I have had no adult or late adolescent patients with Gender Dysphoria or the

previous diagnosis of Gender Identity Disorder experience a resolution of these clinical symptoms without one or more medical interventions such as cross-sex hormones or surgery.

17. In light of his purported concerns about the need for evidence-based treatment protocols, it is ironic that Dr. Hruz is willing to hypothesize about psychological treatments without any evidence supporting his claims. As a board certified psychiatrist and a Distinguished Fellow in the American Psychiatric Association, I can categorically state that the tools used in my profession (various psychotherapies, psychotropic medications, electroconvulsive therapy, etc) are not effective treatments for patients with moderate to severe Gender Dysphoria, and this is the overwhelmingly prevailing view amongst psychiatrists knowledgeable about this diagnosis (see Byne W, Karasic, D, et al: gender dysphoria in adults: An overview and primer for psychiatrists, Transgender Health 3:57-70, DOI: 10.1089/trgh.2017.0053; 2018).

18. Dr. Hruz appears to miss the point of the Hippocratic admonition to "do no harm." Hruz ¶ 30. To do nothing is not equivalent to doing "no harm," and to provide only "supportive psychotherapy" to someone with severe Gender Dysphoria is akin to doing nothing. There are many examples of prisoners with gender dysphoria who have been treated with only "supportive psychotherapy" who then go on to complete autocastration (also known as surgical self-treatment) and engage in multiple suicide attempts (see my publication for case examples from my own experience: Brown G: Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder, International Journal of Transgenderism, 12(1):31-39, 2010. DOI: 10.1080/15532731003688970). I have provided expert testimony in many cases in which courts concluded that depriving transgender prisoners of medical treatment for gender dysphoria is so harmful that it constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment. *See, e.g.*, *Fields v. Smith*, 712 F.

6

Supp. 2d 830, 839 (E.D. Wis. 2010), *supplemented* (July 9, 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011).

19. For these reasons, it is clear to me that the type of prospective studies Dr. Hruz is suggesting would not be found ethically permissible by any research review board in the United States. Doing so would ignore the decades of evidence showing the efficacy of both cross-sex hormones and sex reassignment surgeries for patients diagnosed and managed using the accepted standards of care, and the evidence that psychotherapies alone, of any type, have not been effective and, without other interventions, prolong suffering with potentially lethal outcomes. See Adams, Pearce, et al, 2017, for a recent review on this topic (Guidance and Ethical Considerations for Undertaking Transgender Health Research and Institutional Review Boards Adjudicating this Research. Transgender Health 2(1): Published Online:1 Oct 2017 https://doi.org/10.1089/trgh.2017.0012).

**Dr. Sutphin holds surgery for gender dysphoria to a different medical standard based on his non-expert views about psychiatric conditions**

20. For his part, Dr. Sutphin seems to acknowledge that it is impossible to develop randomized, prospective studies for many types of accepted medical treatments, such as tonsillectomies and appendectomies. Sutphin Report ¶ 43. But Dr. Sutphin argues that surgery for gender dysphoria should be held to a higher standard of proof and supported by "an exceptional quality of data." Sutphin Report ¶ 46.

21. Dr. Sutphin demands that surgery for gender dysphoria meet this higher burden of proof because he claims that "[u]nique to sex reassignment surgery is the concept that the impetus for state funding of a procedure shall be 'strong desire" or "want." Sutphin Report ¶ 45. To illustrate the point, Dr. Sutphin compares the mental state of a transgender patient requiring

7

medically necessary surgery for gender dysphoria to the mental state of a non-transgender woman seeking cosmetic breast augmentation to enhance her self-esteem. *Id.*

22. Dr. Sutphin has not indicated that he has any training or experience in psychiatry, and he has no qualifications to offer an expert opinion on psychiatric questions. Dr. Sutphin's attempt to minimize the medical needs of individuals with gender dysphoria, who have a serious diagnosable psychiatric condition and suffer severe psychiatric symptoms, by comparing them to people seeking cosmetic surgery reflects his own ignorance of this serious medical condition.

23. Dr. Sutphin also ignores the critical roles that mental health professionals play under the WPATH Standards of Care: evaluating patients for surgery and ensuring that the patient has reasonable expectations for transition. As the WPATH Standards explain: "Genital and breast/chest surgical treatments for gender dysphoria are not merely another set of elective procedures. Typical elective procedures involve only a private mutually consenting contract between a patient and a surgeon. Genital and breast/chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals[.]" WPATH SoC 55. Among other things, "mental health professionals can facilitate the development of an individualized plan with specific goals and timelines" and ensure that the patient has an "awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role." WPATH SoC 29-30.

24. Dr. Sutphin also falsely suggests that transition-related surgery is frequently associated with "[p]oignant regret and vacillation." Sutphin ¶ 22. In fact, when prescribed in accordance with the WPATH Standards of Care, reports of regret from transition-related surgery are extremely low. Even in one of the earliest meta-analyses of the outcome data completed in

1998 covering the period of 1961-1991, the "regret" rate (those patients who reported they regretted having had sex reassignment surgery) was less than 1% in transgender men and between 1-1.5% in transgender women (Pfaffalin F, & Junge A: Sex reassignment: 30 years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991. International J Transgenderism; Retrieved from http://web.archive.org/web/20070503090247/http:/www.symposion.com/ijt/pfaefflin/1000.htm. More recent studies also show that most people are very satisfied after medical and surgical treatments for gender dysphoria and display improved psychosocial functioning, alleviation of gender dysphoria symptoms, and high employment rates (see, for example, De Cypere G: Mental Health Issues, in R Ettner, et al editors, The Etiology of Transsexualism, in Principles of Transgender Medicine and Surgery, 2nd ed. 2016, pp 109-110; Gijs L & Brewaeys A: Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. Annual Review of Sex Research, 18, 178–224, 2007; Ruppin U, Pfafflin F: Long-term follow-up of adults with gender identity disorder. Archives Sex Behav 44:1321-1329, 2015). Regrets for all forms of sex reassignment surgery remains well below 2% in all studies cited.

25. The only medical literature Dr. Sutphin cites in support of his speculation about regret concern patients who received surgery without following the WPATH Standards of Care or who received surgery over 30 years ago before the WPATH Standards of Care were first adopted. *See* Sutphin Report ¶ 23 (citing Djordjevic); Sutphin Report ¶ 32 (citing Meyer 1977). He does not, however, provide the actual statistics on regrets (which are 0.5-2%), and fails to note that the case reports he cites are a very small fraction of Dr. Djordjevic's patients.

26. Dr. Sutphin holds out the example of Johns Hopkins as an example of an esteemed institution that stopped doing SRS (Sutphin Report ¶ 33). What Dr. Sutphin failed to add was that Johns Hopkins has reinstated a full-service Transgender Health Clinic, which includes access to hormonal and genital surgical care, following the WPATH Standards of Care (https://www.hopkinsmedicine.org/center_transgender_health/index.html).

27. To justify subjecting treatment for gender dysphoria to a higher standard of proof, Dr. Sutphin states (¶ 46) that operating on healthy "physiologic [sic] organs" is unique to the diagnosis of gender dsyphoria. That is incorrect. For example, bariatric surgery (gastric bypass surgery), is a medically necessary procedure for some patients with severe obesity and extremely high body mass indices. These patients' stomachs are normal, healthy tissue, but the most effective procedures involve significant surgical interventions involving their otherwise normal stomachs and small intestines that induce a malabsorption syndrome that they did not previously experience. This iatrogenically induced digestive disorder is responsible, in large part, for the substantial weight loss experienced by many morbidly obese patients.

28. Dr. Sutphin also notes that genital surgery for gender dysphoria requires specialized training and expertise. Sutphin ¶¶ 21, 28-29. That is true for many types of surgeries, such as Roux-en-Y gastric bypass surgery (which accounts for 47% of gastric bypasses mentioned above), joint replacements, or radical prostatectomies. In any event, Dr. Sutphin's comments about specialization do not apply to mastectomies, which are very common procedures performed by general surgeons as well as those with more intensive training.

**Dr. Hruz and Dr. Sutphin mischaracterize the medical literature regarding suicidality**

29. Dr. Hruz repeatedly suggests that those who have had treatment are equally, or more likely, to have post-treatment suicidality. Hruz ¶ 35. This is simply not true, and neither

expert can cite literature supporting that statement. Even an early study that had retrospectively matched control groups showed that those in the post-operative SRS group had the lowest rates of suicidality compared to those on a wait list for SRS (Mate-Kole C, Freschi M, & Robin A: Aspects of psychiatric symptoms at different stages in the treatment of transsexualism. Br J Psychiatry.152:550-3, 1988). I have already addressed Dr. Hruz's mischaracterizations of the Dhejen study in my supplemental report.

30. Neither Dr. Hruz nor Dr. Sutphin indicate that they have ever treated suicidal gender dysphoric patients. As a psychiatrist who has personally treated severely gender dysphoric patients for over three decades, I have seen patients have complete resolution of their suicidality and depression after receiving appropriate care (hormonal and sometimes surgical) following the accepted medical standards outlined by the WPATH Standards of Care and the Endocrine Society guidelines. Likewise, I have witnessed the suicidality, depression and autocastration attempts experienced by gender dysphoric prisoners who are denied access to medically necessary hormones and/or surgery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of June, 2018

George R. Brown, MD