IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| TERRI BRUCE, | ) | Case No. 17-5080 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF SOUTH DAKOTA and | ) | |
| LAURIE GILL, in her official capacity as | ) | |
| Commissioner of the South Dakota Bureau | ) | |
| of Human Resources, | ) | |
| | ) | |
| Defendants. | ) | |

## Expert Declaration of Daniel Sutphin MD, FACS

1.      I, Daniel D. Sutphin, have been retained by counsel for Defendants as an expert witness in the above captioned litigation.

2.      I am a practicing plastic surgeon presently working in the medically underserved area of Yuma County in southwest Arizona. I earned my Doctor of Medicine from the University of Tennessee, College of Medicine in Memphis in 2004. I am licensed to practice medicine in the states of Tennessee, California, New Mexico, and Arizona.  I am board certified by the American Board of Surgery and the American Board of Plastic Surgery.  In addition, after completing a general surgery residency and a plastic surgery residency at the University of Tennessee, I completed an additional year of fellowship training in reconstructive microsurgery at the University of California, San Francisco.  I am a Fellow of the American College of Surgeons and a member of the American Society of Plastic Surgeons.  In the scope of my practice, I have provided surgical care to heterosexual, homosexual, bisexual and transsexual patients of multiple racial and religious backgrounds. I also provide care for incarcerated patients, as well as

uninsured and underinsured patients including illegal immigrants. A detailed list of my credentials may be found in Exhibit A which is attached.

3.       Opinions expressed in this declaration are based upon my knowledge and professional experience in the matters discussed. I have relied upon the same types of materials that other experts in my field of practice rely upon when forming and rendering opinions. I have reviewed the following case specific materials: 1) Terri Bruce's Complaint; 2) Answer to Complaint; 3) Answers to Plaintiff's First Set of Interrogatories; 4) Declaration and subsequent addendum of Dr. George Brown; 5) Declaration of Dr. Anne Dilenschneider; 6) Dr. Snyder records; 7) HMP denial of a pre-authorization for a mastectomy; and 8) pages from the South Dakota Health Plan. A list of other materials I have relied on is attached as Exhibit B to this declaration.

4.       At Paragraph 44 of the Complaint, it is stated: *On May 3, 2016, Mr. Bruce visited Dr. Mary Snyder of Black Hills Plastic Surgery, to whom he was referred by his primary care physician, and a mastectomy* [for purported] *gynecomastia was scheduled for June 22, 2016 as part of his medically necessary treatment for gender dysphoria.* The Complaint alleges Mr. Bruce's need for "chest reconstructive surgery" "in accordance with the widely accepted standards of care for treating gender dysphoria." (Plaintiff's Complaint, ¶4.)

5.       The code submitted for approval by Mr. Bruce's state insurance plan is CPT code 19300. Importantly, this is the code for removal of male breast tissue for gynecomastia as is well defined in the reference utilized by Mr. Bruce and clinically commonly understood.[1, 2]

6.       Mr. Bruce's expert psychologist notes that "the patient continues to experience clinically significant dysphoria . . . related to his female breasts" (Dilenschneider, p. 2). Mr. Bruce's surgeon (Dr. Snyder) describes "persistent gynecomastia" and states Mr. Bruce is "interested in

correction of his gynecomastia".

7.     There are biological differences in the male and female breast. Aside from the more readily apparent and commonly understood phenotypic differences, in male breast tissue, terminal lobules are normally absent.[3] Even the histologic effects produced by high levels of estrogens utilized in male to female transition are unlike gynecomastia.[34]

8.     Gynecomastia is the abnormal enlargement of the natal male breast.[27] However a patient may identify in terms of gender, if the patient is a natal female with XX chromosomes and breasts that to date have not been surgically removed, irrespective of obesity, the patient does not have "gynecomacromastia refractory to weight loss. (Dr. Snyder's letter dated 5/3/2016) The patient has natal female breasts.

9.     The patient has female breasts with all the inherent (and amplified) postmenopausal risks of the same[4], as well as anatomic characteristics incumbent on the surgeon to recognize and address in order to achieve the best aesthetic outcome.[18, 26, 37]

10.    While the Plaintiff in this case has legally changed his name and has been taking testosterone for a period of time, he remains biologically female. This fact is not a psychosocial, discriminatory, malicious or ill intended construct but rather a biological reality.

11.    The male and female sexual reproductive organs are distinctly and self-evidently unique. They are perhaps one of the best biological illustrations of the truism that form relates to function. The inherent complexity of these systems is reflected in the degree of specialized medical care devoted to them in the fields of urology, gynecology, obstetrics and urogynecology. To this end, those individuals affected by gender identity disorder may desire surgical revision of their physical body such that it reflects the body of the sex the patient most identifies with. In

layman's terms, such procedures are often broken into "top" or "bottom" surgery sub classifications. Very generally, "top" surgery refers to surgical obliteration of the breasts (thereby producing a more male physique) or augmentation thereof (to create a more feminine physique). "Bottom" surgery includes a series of procedures designed to obliterate the biologically native genitals (including the penis and scrotum or the vagina and labia as well as the uterus, ovaries and /or fallopian tubes) while fashioning a reasonable facsimile of those of the desired sex. Such surgeries are inherently more complex and irreversible.

12.     A biological man seeking a so called "bottom" surgery would purse one or more of a series of surgeries including amputation of the penis (penectomy), surgical castration (orchiectomy), and fashioning of a neovagina (either from the remaining skin envelope of the inverted penis and scrotum or by cutting a segment of small bowel or more commonly large bowel and moving it to a position between the patient's where it may serve as a vaginal analog). A biological female patient on the other hand seeking a "bottom surgery" is generally pursuing obliteration of the natal vagina and/or internal sexual organs including the uterus ovaries and fallopian tubes. The fashioning of a phallus of some form represents the sine qua non of such a transition. This may be attempted through surgical alteration of the clitoris and modification of the urethra (urinary tube) to in essence exteriorize the same. This may allow the patient to void while standing. However, for a patient who wishes to engage in penetrating intercourse, a neophallus must be constructed and then augmented with some form of permanent prosthesis to provide static or dynamic rigidity to the point that penetration can be achieved. Such procedures represent the apex of technical and reconstructive complexity and generally require multidisciplinary surgical teams. These procedures are understandably irreversible as the

patient, despite any future attempts at reversal, will never be able to achieve the degree of form and function present in the extirpated natal sexual organs.

Candid and expert surgeons detail this fact clearly in perioperative discussion and consent forms. Likewise, well defined consent for such procedures will outline not only generic risks potentially associated with most surgeries, such as infection, bleeding, pain and numbness, but also risks distinctive to such procedures including diversion of urinary stream, loss of erogenous sensation, and failure to achieve the natural and desired appearance of the external genitals (which may perpetuate a cycle of revisional surgery and scarring). More dramatic and life altering sex reassignment risks of "bottom" surgery include but are not limited to infertility, urinary incontinence, inadvertent bowel injury requiring a diverting intestinal ostomy (the intestine may be drawn out of the abdominal wall and diverted into a collecting bag), urethral stricture with associated increased risk of chronic urinary tract infection, and colovaginal fistula (or communication between the residual colon and the "neovagina" allowing stool to issue from both)

13. Whether or not such risks are determined by the patient and physician to be justifiable, it goes without saying that surgical technique does not and cannot alter a person's cellular and chromosomal identity.

14. From a fiscal perspective, it is difficult to know an exact number regarding the cost of such procedures as there is no transgender cost control or cost analysis consortium at present. However, an uncomplicated phalloplasty can readily cost $75,000 excluding the cost of antecedent procedures (including hysterectomy and oophorectomy). That is to say nothing of followup logistics (such as home health care, durable medical equipment and travel by ground or

air and hotel accommodations) or post-operative complications. Any attempt at reversal (e.g a male to female patient transitioning back to male and desiring penile reconstruction after prior penectomy) is often higher risk and more technically complex. It will be performed at a tertiary center by a team of experts with a resultant cost reflective of the same.

15.     Even for transgender patients in the midst of transition, attempted chemical obviation of the patient's biologic sex can have a significant impact on surgical options available for sex reassignment. For example, Dutch authors Bouman et al. detail their experience with natal male patients given exogenous hormone therapy to circumvent physiologic puberty and masculinization. By the time such patients moved forward with penectomy and neovaginal reconstruction at an average of 21.1 years of age, their penile scrotal size was inadequate to complete penile scrotal inversion. As a result, an operation with inherently greater complexity using a segment of colon as a vaginal substitute was instead required.[15]

16.     Contrary to the WPATH categorization of hormonal therapy as "reversible" or "partly reversible"[20] the observations of these surgeons also point to another important fact; chemical castration may also lead to significant anatomic changes with tangible surgical consequences.

17.     As surgeons, if we ignore or attempt to controvert such facts, we may do so at the potential peril of the patient.

18.     The importance of accurately indicating the patient's biological sex is pragmatically and clinically important. For instance, in male to female patients who have undergone neovaginoplasty utilizing a segment of colon, it is clinically relevant to know that the patient's "vagina" is in fact a segment of colon with colonic mucosa rather than vaginal squamous epithelium. Though the patient may appear and indeed feel feminine, an examining gynecologist

will need to be aware that the cervix is physiologically absent and she or he will need to become familiar with prostate exams or else refer the patient to an urologist with greater familiarity with such otherwise routine assessment. In such a patient, what standard of surveillance for colonic columnar mucosa will be recommended to her over a twenty year period?[10, 11, 12] Histologically, how does columnar mucosa behave on a cellular level when subjected to the otherwise physiologic and minor trauma that vaginal squamous mucosa tolerates over the same time without adverse effect?[10, 11 12] What do we tell the patient who inquire regarding the future risk of getting colon cancer in the neovagina?[10, 11, 12] Is it the same as that in biological females? Questions such as these are relevant but unanswered.

19.    At present there are no randomized studies on the effects of long-term testosterone use on breast cancer risk.[5] The risk of breast cancer in transgender patients is still being defined. Also at present, there are no evidence based radiographic guidelines in place regarding transgender patients.[6]

20.    I hold a number of concerns regarding sex reassignment surgery (SRS). Attempting to besmirch any candid objections to sex reassignment surgery as "lacking rational basis, grounded in sex stereotypes and moral disapproval of people who are transgender" (Complaint, ¶64) is not a substitute for the recognition and treatment of associated psychopathology.[7] Neither is such itemized castigation a valid answer to legitimate concerns raised by some proponents of SRS.[8,9,17,21,25,29,30,35]

21.    As a surgeon, I do not offer elective procedures to patients unless I have a high degree of confidence that the methodology of the procedure in question is sound and that the expected result will consistently produce a specific outcome. For me to offer a procedure in a safe and

efficacious manner, this must be true not only based on what a select group of surgeons can produce under select circumstances, but must also be reproducible with my own hands and with the resources available at my disposal.

22.     Poignant regret and vacillation regarding the surgical outcome of sex reassignment surgery as expressed by patients who have undergone such surgery has also even been described in media outlets such as Newsweek, the BBC,and lgbtqnation.com.[13, 14, 35]   These outlets are not generally regarded as bastions of "sex stereotypes, discomfort with gender nonconformity, and moral disapproval of people who are transgender" such as those Mr. Bruce's Complaint cites as purported grounds for the State's gender transformations exclusion.  (Complaint, ¶ 64).

23.     Indeed, one of the most prolific and widely recognized surgical experts in the field of gender reassignment surgery, Dr. Miroslav Djordjevic has noted a number of patients in his practice seeking reversal of their sex reassignment surgeries.[21]

24.     Given the above factors and the inherent variability of the transgender patient population,[20, 36] the candid surgeon cannot help but consider the definitive and truly immutable change many such procedures bring by default.  Few clinicians have better described this imperative than Goin:  "When a new patient requests an operation, the surgeon must ask himself or herself if this is someone whose perceptions of his or her body are more or less realistic or whether there is a severe body image distortion present that no operation can cure."[19]

25.     Expressing a similar candid caution, Dr. Charles L. Ihlenfeld has observed, "Whatever surgery did, it did not fulfill a basic yearning for something that is difficult to define. This goes along with the idea that we are trying to treat superficially something that is much deeper."[22] Importantly, Dr. Ihlenfeld is a psychiatrist who, while working alongside Dr. Harry Benjamin

(the pioneering founder of what has evolved into the current WPATH organization), treated transsexual patients as a regular part of his practice. According to a brief personal biography,[23] Dr. Ihlenfeld wed his partner of 37 years Dr. Bill Packard in 2008. Despite his caution regarding the limitations of sex reassignment surgery, it is understood that Dr. Ihlenfeld does not harbor "sex stereotypes, discomfort with gender nonconformity, and moral disapproval of people who are transgender." (Complaint, ¶ 64).

26.     Accordingly, an individual or organization, who in their own professional deliberations, express reservation regarding or declines to perform or endorse sex reassignment surgery cannot de facto be billed as harboring irrational malice towards those patients who seek such procedures or those clinicians who perform them as part of their professional practice.

27.     Furthermore, sex reassignment surgery has not achieved the level of de facto safety and wide familiarity such as suggested by the declarations of the Complaint and Dr. Brown.

28.     "It's a major complicated operation compounded by significant preop considerations and significant postop care. They're work intensive…if it's too many in too short a time, the entire clinic staff can become overloaded", observes Dr. Bill Kuzon of the University of Michigan.[30] Dr. Loren Schechter, a surgical contributor to WPATH cautions regarding sex reassignment genital surgery, cautions that "we can't really dabble in this, as they are vastly more complex procedures."[30] Dr. Jess Ting, surgical director at the Mount Sinai Center for Transgender Medicine and Surgery, observes that sex reassignment surgery "operations are complex, and many come with perilous sets of complications."[29]

29.     In fact, a number of surgeons with extensive experience in the field are now advocating formalized fellowship training in order to enhance the safety of sex reassignment surgeries for

patients who elect to undergo them.[8, 29]

30.     The number of various types of surgery now performed in gender reassignment is no less than 43.[8]

31.     Despite Dr. Brown's characterizing individuals who question the validity of sex reassignment surgery as individuals with "fringe viewpoints that fall far outside the medical mainstream, (Brown, Addendum ¶14), the efficacy of such surgery, particularly with regard to complication rate and cost, remains unverified in terms of durable objective benefit.

32.     Likewise, Dr. Brown's discounting of Defendants' denial of the allegation in the Complaint that "there is no legitimate medical justification" for the gender transformations exclusion (Answer, ¶¶ 9, 22) as perhaps "true 30 years ago, but …clearly out of step with recent decades of work in this field" (Brown, ¶ 37) is interesting to note, particularly in light of the fact that the Dhejne study, the longest and most comprehensive of its kind to date covering virtually every psychiatric admission in Sweden since 1973, was conducted over a thirty year time span.[9]

33.     Interestingly, the observations of this study were not dissonant with others conducted over the preceding four decades, including the work presented by Meyer in 1977 which led to the temporary cessation of the surgical gender reassignment program at Johns Hopkins.[24]

34.     Even the American Psychiatric Association notes in its 2012 task force report on treatment of gender identity disorder that "The quality of evidence pertaining to most aspects of treatment in all subgroups was determined to be low" and "subjective improvement" is relied upon as "the primary outcome measure."[16]

35.     Valid patient-reported outcome measures for the transgender patients that are sensitive enough to assess gender confirmation surgery without the influence of other gender related

interventions remain lacking.[17]  In addition, the high number of unreliable instruments used in current literature not only yields uncertain results but also precludes dependable comparison between different studies.[17]

36.     Likewise, despite surgical sex reassignment, rates of mortality, suicidal behavior and psychiatric morbidity remain elevated in the transsexual population monitored over a 30 year period.[9]

37.     Dr. Brown observes that the Dhjene study did not compare such results to that of a nonsurgical transgender patient population (Brown, Addendum ¶¶15-16).  The authors of the study note this as well.[9]  They conclude, however, based on their findings, that "Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."[9]  Accordingly, while the nonsurgical transgender patient population is of significance, it is well to recall that in the case under consideration, Mr. Bruce is seeking surgery to support gender reassignment.

38.     Thus in keeping with all the above, there are valid reasons for questioning whether sex reassignment surgery is an option that the State wishes to, or should be forced to, include as a standard component of its health plan.

39.     Furthermore, as a surgeon certified by both the American Board of Surgery and the American Board of Plastic Surgery, neither Board has to date declared any defined standards of care for treating gender dysphoria, "widely accepted" or otherwise.  Also, as they are noticeably absent in the Complaint and Dr. Brown's declarations citing "every major medical organization" (Complaint, ¶ 8) and "every major medical organization in the United States"(Brown, ¶ 38),  it is

unknown whether the American Board of Surgery, the American Board of Plastic Surgery, the American College of Surgeons, and the American Society of Plastic Surgeons are considered by Plaintiff and Dr. Brown as legitimate sources of valid guidance in the case under discussion. Contrary to Dr. Brown's written statement, I am unaware of any such surgical body that has reached consensus that "transition related care including. . . .surgery is medically necessary and effective treatment for individuals with gender dysphoria."(Brown, ¶ 38).

40.    Though the Complaint references the 2008 American Medical Association passage of Resolution 122 as an example of "medical consensus" (Complaint, ¶¶ 32-33), the AMA has for some years now been known to represent only approximately 15% of practicing United States physicians.[28]  This hardly constitutes the quorum of 75% of such physicians noted in the 1950s.[28]

41.    According to Hazen et al. reporting on female to male genital reconstruction options alone, "The vast majority of existing information on outcomes in female-to-male genital reconstruction is considered low-quality evidence.  Existing studies on patient satisfaction are limited by a general lack of validated, standardized methods, a paucity of controlled studies, little prospective data collection, and poor response rates in long-term follow-up studies. In addition, there is enormous variation in follow-up periods.  Emphasis is placed on the need to develop "standardized methods to assess the outcomes of surgery" in terms of quality of life before and after surgery, and long-term data collection on preoperative versus postoperative sexual function/ satisfaction."[25]  In addition, the authors of review found "Perhaps most notably. . . no reports of direct comparisons or analyses investigating how outcomes differ by surgical technique. Similarly, the factors influencing patients' decisions to pursue (or forego) female-to-male transgender procedures have scarcely been considered.  There exists no evidence or proposed

algorithm to offer surgeons and female-to-male transgender patients guidance in determining the most appropriate technique."[25]

42.     It should be noted that the findings of these authors do not represent "fringe viewpoints that fall far outside the medical mainstream" (Brown Addendum, ¶14), but rather experienced and well qualified surgeons operating out of tertiary centers with internationally based faculty. Likewise, they cannot be said to harbor "moral disapproval of and discomfort with transgender people and gender transition." (Complaint, ¶ 55).

43.     Dr. Brown also wisely points out that if the best standard of prospective research were to be categorically used in determining whether a procedure or modality is accepted for treatment purposes, some modalities would never be implemented in clinical care.  (Brown Addendum, ¶ 11).  This is a valid and well-made observation.

44.     Along that line, however, there is also an attempt to demonstrate an analogy regarding to two commonly performed procedures (those being tonsillectomy and appendectomy), while noting that sex reassignment surgery is, in such prospective sense, by no means exceptional. (Brown Addendum, ¶¶ 11-12).

45.     This is problematic in a number of regards, technically and conceptually.  Unique to sex reassignment surgery is the concept that the impetus for state funding of a procedure shall be "strong desire" or "want."  According to the American Society of Plastic Surgeons, over 290,000 breast augmentations were completed in the U.S. alone in 2016.[33]  It is understood that these patients indeed had a "strong desire" and "want" to alter the appearance of their otherwise physiologically normal breasts.  Indeed, they found the discordance between the reality of their desire and the state of their body "distressing" to the point that they sought and underwent

surgery. However, I am unfamiliar with any precedent or expectation that such procedures would be considered "medically necessary" and thus covered by state insurance plans. This is true no matter how severely distressing the patient may find the degree of her breast ptosis, micromastia or postpartum involution to be.

46. In sex reassignment surgery, organs uniquely characteristic of the male and female sex are removed and/or reasonable anatomic facsimiles fashioned in an effort to ameliorate the discordance between what the patient feels regarding their gender and the reality of their natal sex. It seems then that such a procedure, unique in all of medicine, in which an otherwise physiologic organ is removed based on the seminal impetus of patient desire and perception, should be supported by a correspondingly exceptional quality of data.

47. In citing the Cochrane review of appendectomy vs antibiotic treatment[32] (Brown Addendum, ¶ 12), Dr. Brown leaves unaddressed the fact that management of acute appendicitis has sound basis in practice and medical literature to achieve resolution of an organic disease state and not a psychiatric disorder, to say nothing of dysphoria. In terms of complexity and associated risk as above outlined, it is quite unlike sex reassignment surgery. Indeed, surgical management of appendicitis has been so well described, established and reproducibly practiced that freedom now exists to clinically question whether less invasive and less expensive means of treatment can produce the same safe and durable result for patients[31]; whether, in essence, less rather than more can be used to achieve the same clinical result; whether medication, rather than a surgical intervention with all its inherent risk, can be offered to the patient with the same benefit.[32]

48. Whatever the perceived subjective benefits of sex reassignment surgery may be,

application of these now no less than 43 different such surgeries[8] involves "more", not "less" in the sense of technical complexity, invasiveness, irreversibility, cost, resource allocation, and operative patient risk.

49.     During the past four years, I have provided expert testimony on one occasion in the following:

   A.    *Robert Sauceda v. Triple J Excavation and Builders Trust of New Mexico*, WCA No. 14-01199, Deposition August 26 2016.

50.     I am being compensated on an hourly basis for all time devoted to review of records, literature and submissions related to the above said case at a rate of $400 per hour. Any deposition to follow shall be at a rate of $475 per hour and $550 per hour for in person court testimony. Travel related expenses including commercial airfare, ground transportation and room and board shall be compensated fairly. Compensation as outlined is independent of the opinions expressed, testimony provided or ultimate outcome of the case noted.

51.     The above opinion is subject to the limitations of medical science reviewed herein. It should also be noted that to date, I have not met with nor professionally evaluated plaintiff Terri Bruce.

52.     I may supplement these opinions and facts in response to information produced by the Plaintiff, in further response to the Plaintiff's expert disclosures, and/or as new data within my field of expertise becomes available.

53.     Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____ May 28 2018 _____

Signed: _____            Daniel Sutphin, MD FACS

15