EXHIBIT 3

1   IN THE UNITED STATES DISTRICT COURT FOR
2   THE DISTRICT OF SOUTH DAKOTA
3
4
5
6   TERRI BRUCE,                              )
                                              )
7                        PLAINTIFF,           )
                                              )
8   VS.                                       )    NO. 17-5080
                                              )
9   STATE OF SOUTH DAKOTA                     )
    and LAURIE GILL, in her official          )
10  capacity as Commissioner of the           )
    South Dakota Bureau of Human              )
11  Resources,                                )
                                              )
12                       DEFENDANT.           )
13
14
15            DEPOSITION OF DR. GEORGE BROWN, M.D.
16                     AUGUST 20, 2018
17                  Johnson City, Tennessee
18                        9:00 a.m.
19
20
21  Reported By:
    PEGGY F. MCCRORY, LCR #532
22
23
24
25

1  Appearances:
2
3  On Behalf of the Plaintiff:
4    American Civil Liberties Union Foundation
       125 Broad Street, 18th Floor
5      New York, NY 10004
       BY: JOSHUA A. BLOCK, ESQ.
6          lcooper@aclu.org
7  On Behalf of the Defendant:
8    Jerry Johnson Law Office
       909 St. Joseph Street, Suite 800
9      Rapid City, South Dakota 57701
       BY: JERRY D. JOHNSON, ESQ.
10         jdjbjck@aol.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1             S T I P U L A T I O N
2          The deposition of DR. GEORGE BROWN, M.D.,
3  called as a witness at the instance of the defendants, for
4  purposes of discovery, pursuant to the Federal Rules of Civil
5  Procedure, taken by agreement on the 20th day of August, 2018,
6  at the Carnegie Hotel, 1216 State of Franklin Road, Johnson
7  City, Tennessee, before Peggy F. McCrory, Registered
8  Professional Reporter and Notary at Large.
9          It being agreed that Peggy F. McCrory,
10 Registered Professional Reporter and Notary at Large, may swear
11 the witness, report the deposition in machine shorthand,
12 afterwards reducing the same to typewriting.
13         All objections except as to the form of the
14 questions are reserved to on or before the hearing.
15         It being further agreed that all formalities
16 as to the notice, caption, certificate, transmission, et cetera,
17 are expressly waived.
18         DR. GEORGE BROWN, M.D.,
19 called as a witness at the instance of the defendants, for
20 purposes of discovery, having been first duly sworn, was
21 examined and deposed as follows:
22
23
24
25

1  EXAMINATION BY
2  MR. JOHNSON:
3     Q    State your name for the record, please.
4     A    George R. Brown, M.D.
5     Q    And the records reflect that we're here to
6  take the deposition of Dr. Brown pursuant to notice.
7          Dr. Brown, you've had your deposition
8  taken before?
9     A    Yes, I have.
10    Q    Okay. So you know the rules; I'll ask
11 questions and you have to answer verbally?
12    A    Yes.
13    Q    It will help the court reporter if neither
14 one of us nod our head or say huh-uh or uh-huh. Just answer
15 verbally.
16    A    Yes.
17    Q    At some point during this deposition I
18 will probably ask a question that makes no sense, and if that
19 happens, you let me know and I will rephrase it. Fair enough?
20    A    Yes.
21    Q    And if during this deposition it appears
22 though I misunderstood one of your answers, will you bring that
23 to my attention as well and we'll clear that up?
24    A    Yes.
25    Q    Okay. And you're kind of soft spoken, I

1  can tell, and I talk kind of fast --
2     A    Not normally. I'm not normally soft
3  spoken. I'm sick today.
4     Q    Okay. All right. Sorry about that.
5          I talk kind of fast. So I will try and
6  slow down and you try and talk a little louder, okay?
7     A    Yes.
8     Q    You are a professor here at the medical
9  school in Johnson City, Tennessee?
10    A    Yes. I am professor and associate
11 chairman at the medical school. It's literally a tenth of a
12 mile from where we're sitting.
13    Q    Okay. And you've been hired as an expert
14 on behalf of the plaintiff, Mr. Bruce?
15    A    Correct.
16    Q    When were you first contacted about this
17 lawsuit?
18    A    Probably sometime in late 2017, best of my
19 recollection.
20    Q    And do you remember who contacted you?
21    A    I believe it was Mr. Block.
22    Q    Okay. Up to that point in time had you
23 ever worked with Mr. Block before?
24    A    Yes, I have.
25    Q    And how many times?

| Page 58 | Page 60 |
|---|---|
| 1  reassignment surgery, which types of surgery are most | 1    Q    Value to you in your practice.  Value to |
| 2  appropriated and what types of physician criteria and care | 2  Dr. Schechter in his practice. |
| 3  settings are needed to ensure that patients achieve improved | 3    A    Well, it's pretty dated at this point.  I |
| 4  health outcomes." | 4  mean, they're relying on things well before 2016.  So it has |
| 5           That was part of the decision summary of | 5  some value maybe up to that point in time.  But obviously things |
| 6  the 2016 memo decision, correct? | 6  have proceeded and progressed since then.  There are a number of |
| 7    A    Correct. | 7  big studies, including my own, that have come out since this |
| 8    Q    And you didn't cite any of that language | 8  study.  Outcome studies that have come out since this study.  So |
| 9  in your first report, did you? | 9  it's one snapshot in time.  So it's, at this point, almost a |
| 10    A    No. | 10  historical document. |
| 11    Q    You just cited the 2014 decision. | 11    Q    August of 2016 is now a historical |
| 12    A    Right. | 12  document. |
| 13    Q    Do you think that the conclusions and | 13    A    A rapidly evolving field. |
| 14  viewpoints of the CMS board in 2016 represents a fringe | 14    Q    Was the 2014 document you cited in your |
| 15  viewpoint? | 15  report a historical document? |
| 16           MR. BLOCK:  Objection as to the term "CMS | 16    A    Based on the dates, it's historical. |
| 17       board."  It's not the board. | 17  That's what you have to work with. |
| 18  BY MR. JOHNSON: | 18    Q    And you cited it because it supported your |
| 19    Q    Okay.  Do you believe that the 2016 CMS | 19  opinion, isn't that right? |
| 20  decision represents a fringe viewpoint? | 20    A    I'm not saying I disagree with the opinion |
| 21    A    Are you speaking to something specific in | 21  that there are evidence gaps in the 2016 decision. |
| 22  the 72 pages or the entire 72-page document? | 22    Q    You cited the 2014 decision in support of |
| 23    Q    Well, you read that decision.  Do you | 23  your opinion. |
| 24  think that summary decision represents a fringe viewpoint? | 24    A    Yes. |
| 25    A    I need you to focus more on what you're | 25    Q    And that document obviously is older than |
| Page 59 | Page 61 |
| 1  asking me.  Because there's a lot of material here. | 1  the 2016 memo decision. |
| 2    Q    Okay.  What I'm asking you is, and the | 2    A    I can cite literature going back to 1997 |
| 3  reason why is, you called the experts of the defendants | 3  that supports my opinion. |
| 4  representing a fringe viewpoint.  And I'm asking you -- you've | 4    Q    And the 2014 decision is older than the |
| 5  read that decision -- | 5  2016 memo decision, isn't it? |
| 6    A    I would argue that they're actually not | 6    A    Chronologically, yes. |
| 7  experts in this case.  But that's a different question. | 7    Q    And according to that 2016 memo decision, |
| 8    Q    You understand the question, don't you? | 8  that was issued on August 30, 2016, correct? |
| 9    A    No, I don't. | 9    A    Yes. |
| 10    Q    Okay.  The question is, looking at that | 10    Q    Are you saying that the CMS don't do a |
| 11  2016 memo decision and reading the summary of it, do you think | 11  thorough research of the studies and the research up to the date |
| 12  that summary represents a fringe viewpoint? | 12  of its decision? |
| 13    A    No.  I don't believe it represents a | 13    A    I wasn't involved in that process so I |
| 14  fringe viewpoint in that everybody says in all areas of medicine | 14  can't comment. |
| 15  it's the practice of medicine and we incrementally improve what | 15    Q    Okay.  Any of your work that you're |
| 16  we do in all fields of medicine, including gender dysphoria, by | 16  referring to as studies you've done prior to August 30 of 2016? |
| 17  doing yet better and more studies going forward whether it's | 17    A    Yes. |
| 18  bariatric surgery, whether it's psychiatry, whether it's gender | 18    Q    Is it cited in there by the CMS in the |
| 19  dysphoria.  So I would not take issue with any conclusion that | 19  2016 decision? |
| 20  says filling evidence gaps.  There's evidence gaps in every area | 20    A    I don't know.  I would be happy to look. |
| 21  of medicine we do. | 21    Q    Take a break, you can take a look. |
| 22    Q    Okay.  Do you think that 2016 decision has | 22         Don't you keep up on the literature in |
| 23  any value in the field of medicine? | 23  your field? |
| 24    A    I'm having trouble with the question. | 24    A    I do keep up with the literature in my |
| 25  Valuing -- value to who in what way? | 25  field.  But if you're asking me if I know everything that's ever |

1 designing studies and critiquing methodologies.  In fact, I
2 teach that course, you know, at a medical school.
3    Q    Now, Exhibit 51 is case reports in
4 ophthalmology.  And it talks about an overwhelming desire to be
5 blind; similarities and differences between Body Integrity
6 Identity Disorder and a wish for blindness.  Have you ever heard
7 of that phenomenon, a patient that wanted to be blind?
8    A    This just reminds me that nobody wants to
9 be someone's unusual case.  Because everybody has got an unusual
10 case that they want to write up and send it in as a case report.
11 This would be one of those.
12    Q    Okay.
13    A    So that's just a long way of saying no,
14 I've never heard of this.
15    Q    You don't think this case report is legit?
16    A    I didn't say that.  I just have never
17 heard of a case of somebody coming in and wanting to be blind.
18 I have seen hysterical blindness as a psychiatrist, which is a
19 different condition than what's being discussed here.  Five
20 people total.
21         (EXHIBIT 51 WAS FILED.)
22 BY MR. JOHNSON:
23    Q    Hand you Exhibit 52.  Tell me what that
24 is, please.
25    A    Appears to be a paper that I wrote in 1988

1 when I was in training as a psychiatry resident at Wright State
2 University.
3    Q    And you submitted that to who?
4    A    Jefferson Journal of Psychiatry.
5    Q    It was accepted?
6    A    It was.
7    Q    Peer-reviewed?
8    A    I believe so.
9    Q    Okay.  You cited it on your resume?
10    A    I believe so.
11         (EXHIBIT 52 WAS FILED.)
12 BY MR. JOHNSON:
13    Q    All right.  I want to switch gears on you
14 a little bit here.  There's been a lot made of the fact that Dr.
15 Seffin (phonetic) and Dr. Roos are Christians.  Do you believe
16 that Christians are bigoted and discriminatory towards LGBT
17 people?
18    A    When you say a lot has been made of them
19 being Christians, I don't know that that's -- I don't know that
20 that's a fact.  Are you presenting that to me that's a fact?
21    Q    Well, there were a lot of questions put to
22 them what they believe, whether or not their religious beliefs
23 --
24    A    Questions put to them by who?
25    Q    The plaintiff's lawyers.

1    A    Okay.  Because I've not seen Dr. Seffin's
2 deposition.  So I don't know what he was asked.
3    Q    That's fine.  I'm asking you.
4    A    So can you repeat the question?
5    Q    Do you believe that Christians are bigoted
6 and discriminatory toward the LGBT population?
7    A    I think that that is an overly broad
8 generalization.  I think that there are Christians and non
9 Christians who are overly bigoted and discriminatory towards
10 transgender people, gay people, black people, hillbillies,
11 people who are different.
12    Q    Okay.  Of course there are a lot of them
13 who aren't.
14    A    I'm sorry?
15    Q    There's a lot of them who aren't.
16    A    A lot of them --
17    Q    Christians and non Christians who are not
18 bigoted or discriminatory.
19    A    Absolutely.  I agree.
20    Q    Okay.  And you're not part of a fringe
21 group just by virtue of the fact you're a Christian, right?
22    A    Not in the United States.
23         MR. JOHNSON:  Let me look at my notes.  I
24 may be done.
25         (A recess was had.)

1 BY MR. JOHNSON:
2    Q    What you told me off the record.
3    A    Counsel had asked me on break to look at
4 the CMS 2016 document and to respond as to whether any papers
5 that I had authored or co-authored were included in here.  And
6 in looking at the reference list, I found at least one that was.
7    Q    Give me the exhibit number.
8    A    Exhibit 41.
9    Q    And the page?
10    A    Page is whatever this -- 52.
11    Q    And which article?
12    A    The last one.
13    Q    What was the year of it?
14    A    2012.
15         MR. JOHNSON:  Okay.  All right.  Thank
16 you.
17         (A recess was had.)
18         MR. JOHNSON:  I'm done.
19 EXAMINATION BY
20 MR. BLOCK:
21    Q    I just have one, maybe two.  Do you recall
22 how in response to Mr. Johnson's questions you described the
23 2016 CMS memo as a snapshot, a historical snapshot?
24    A    Yes.
25    Q    And you had indicated that studies had

Page 94

1  been conducted after the time period analyzed by the CMS report?
2      A    Right. So the CMS reports, although
3  published in 2016, relies on information that was only published
4  and available probably to the year before that. So I would say
5  '14 or '15 would be the cutoff where they would have had
6  actually been able to get it into the 2016 report. So there
7  have been things -- it's an ongoing evolving field like other
8  areas of medicine, psychiatry and surgery. So this is a field
9  that is evolving and progressing as well. And there have been
10 new reports that I'm pretty convinced that they would have
11 included had they been available.
12     Q    And what reports are those?
13     A    One of them -- of the ones I mentioned
14 earlier, and the first author in one of the papers is
15 Vandergrift (phonetic), and I believe the year was 2017. And
16 it's the European ENIGI, European Network for the Investigation
17 of Gender Incongruence. And it's the multi-country
18 collaborative study that involves pre tests, post test data
19 following patients prospectively who report to any of these
20 countries gender clinics whether they have gender dysphoria or
21 not. It's just based on who shows up and says that they want to
22 be evaluated.
23          Some of those -- most of those people have
24 gender dysphoria but some of them do not. They just show up and
25 present for care. And then they study those people

Page 95

1  prospectively, including the people who are not actually getting
2  treatment. So they looked at people who are not involved or who
3  have dropped out. That's one.
4           And the results of those studies, they're
5  ongoing. And they'll be presenting more of that information at
6  the next WPATH meeting in November. But up to the point what
7  they have presented is that both cross-sex hormones and standard
8  of care sex reassignment surgery or gender confirmation surgery
9  are associated with significant decreases in depressive
10 symptomatology, symptoms of gender dysphoria, body
11 dissatisfaction scores, other things that are actually scaled
12 and scored using measures before and after. And it's ongoing
13 prospectively. That's one.
14          A second one is a paper by Tucker, is the
15 first author, published just in 2018. And this is on veterans.
16 So the population that I specifically have been studying is
17 veterans. I was not an author or co-author on the Tucker paper,
18 but it's a subset of the veterans that I reported on previously.
19 And this subset of veterans, they're looking at patients who
20 accessed hormones and chest surgery and genital surgery and
21 looked at depression and suicidality and some other parameters
22 and found that the patients who got the full treatment of
23 transition-related medical interventions, which is the term they
24 use in that paper, TRMI, had significant high large effect
25 levels of reductions in suicidality and depression after

Page 96

1  treatment. That's another one.
2           A paper that -- well, I was going to
3  mention the Cole paper where they followed 435 patients before
4  and after treatment for suicide attempts. I believe that was
5  already referenced in there. And they found that in male to
6  female patients -- female to male patients, it dropped from
7  21 percent before treatment with hormones to zero percent after
8  treatment with hormones. But I believe that's already
9  referenced but not mentioned in other work.
10          There was a paper by Greta Bauer,
11 B-A-U-E-R, from Canada that was not -- I don't believe it was a
12 prospective study. But it was a study looking at reduction and
13 suicidality for Canadian patients with gender dysphoria who got
14 treatment versus who had not. And those who had got treatment
15 had clear reductions in suicidality and depression. Those are
16 the ones that come to mind. There are others. But off the top
17 of my head, that's what I can remember.
18     Q    And there were some questions about how --
19 about why the 2016 CMS memo wasn't included in your original
20 declaration. But the 2014 decision by the HHS board was
21 included. Do you see any contradiction between the 2014
22 decision and the 2016 decision?
23     A    Well, of course, there are a lot of things
24 that were not included in my reports, including some of the
25 studies that I just mentioned. But, no, I don't see any

Page 97

1  fundamental difference between the two in that there's still
2  both recommending that individualized assessments need to be
3  made for any given patient, which that's the standard of care as
4  far as I'm concerned for all healthcare. And that in properly
5  selected individuals, that sex reassignment surgery or their
6  terminology to the same effect, could be appropriate and
7  medically necessary for those patients.
8           MR. BLOCK: Nothing further for me.
9           MR. JOHNSON: Nothing for me.
10          MR. BLOCK: Great. So you're going to be
11     given a chance to see the transcript of the
12     deposition, and you have an opportunity to review it
13     and to make any corrections. And so I'd recommend
14     that you do that.
15          THE WITNESS: I wish to do that.
16          MR. BLOCK: Excellent.
17          MR. JOHNSON: Off the record.
18          AND FURTHER DEPONENT SAITH NOT.
19            DR. GEORGE R. BROWN, M.D.
20          (Start time 9:00, end time 12:15.)

25 (Pages 94 - 97)