# EXHIBIT 23

1    IN THE UNITED STATES DISTRICT COURT FOR
2         THE DISTRICT OF SOUTH DAKOTA
3
4
5
6  TERRI BRUCE,                          )
                                         )
7                       PLAINTIFF,       )
                                         )
8  VS.                                   )   NO. 17-5080
                                         )
9  STATE OF SOUTH DAKOTA                 )
   and LAURIE GILL, in her official      )
10 capacity as Commissioner of the       )
   South Dakota Bureau of Human          )
11 Resources,                            )
                                         )
12                       DEFENDANT.      )
13
14
15         DEPOSITION OF DR. GEORGE BROWN, M.D.
16              AUGUST 20, 2018
17            Johnson City, Tennessee
18                 9:00 a.m.
19
20
21  Reported By:
    PEGGY F. MCCRORY, LCR #532
22
23
24
25

1 Appearances:
2
3   On Behalf of the Plaintiff:
4     American Civil Liberties Union Foundation
     125 Broad Street, 18th Floor
5     New York, NY 10004
     BY: JOSHUA A. BLOCK, ESQ.
6     lcooper@aclu.org
7   On Behalf of the Defendant:
8     Jerry Johnson Law Office
     909 St. Joseph Street, Suite 800
9     Rapid City, South Dakota 57701
     BY: JERRY D. JOHNSON, ESQ.
10     jdjbjck@aol.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      S T I P U L A T I O N
2     The deposition of DR. GEORGE BROWN, M.D.,
3 called as a witness at the instance of the defendants, for
4 purposes of discovery, pursuant to the Federal Rules of Civil
5 Procedure, taken by agreement on the 20th day of August, 2018,
6 at the Carnegie Hotel, 1216 State of Franklin Road, Johnson
7 City, Tennessee, before Peggy F. McCrory, Registered
8 Professional Reporter and Notary at Large.
9     It being agreed that Peggy F. McCrory,
10 Registered Professional Reporter and Notary at Large, may swear
11 the witness, report the deposition in machine shorthand,
12 afterwards reducing the same to typewriting.
13     All objections except as to the form of the
14 questions are reserved to on or before the hearing.
15     It being further agreed that all formalities
16 as to the notice, caption, certificate, transmission, et cetera,
17 are expressly waived.
18     DR. GEORGE BROWN, M.D.,
19 called as a witness at the instance of the defendants, for
20 purposes of discovery, having been first duly sworn, was
21 examined and deposed as follows:
22
23
24
25

1 EXAMINATION BY
2 MR. JOHNSON:
3   Q     State your name for the record, please.
4   A     George R. Brown, M.D.
5   Q     And the records reflect that we're here to
6 take the deposition of Dr. Brown pursuant to notice.
7     Dr. Brown, you've had your deposition
8 taken before?
9   A     Yes, I have.
10   Q     Okay. So you know the rules; I'll ask
11 questions and you have to answer verbally?
12   A     Yes.
13   Q     It will help the court reporter if neither
14 one of us nod our head or say huh-uh or uh-huh. Just answer
15 verbally.
16   A     Yes.
17   Q     At some point during this deposition I
18 will probably ask a question that makes no sense, and if that
19 happens, you let me know and I will rephrase it. Fair enough?
20   A     Yes.
21   Q     And if during this deposition it appears
22 though I misunderstood one of your answers, will you bring that
23 to my attention as well and we'll clear that up?
24   A     Yes.
25   Q     Okay. And you're kind of soft spoken, I

1 can tell, and I talk kind of fast --
2   A     Not normally. I'm not normally soft
3 spoken. I'm sick today.
4   Q     Okay. All right. Sorry about that.
5   I talk kind of fast. So I will try and
6 slow down and you try and talk a little louder, okay?
7   A     Yes.
8   Q     You are a professor here at the medical
9 school in Johnson City, Tennessee?
10   A     Yes. I am professor and associate
11 chairman at the medical school. It's literally a tenth of a
12 mile from where we're sitting.
13   Q     Okay. And you've been hired as an expert
14 on behalf of the plaintiff, Mr. Bruce?
15   A     Correct.
16   Q     When were you first contacted about this
17 lawsuit?
18   A     Probably sometime in late 2017, best of my
19 recollection.
20   Q     And do you remember who contacted you?
21   A     I believe it was Mr. Block.
22   Q     Okay. Up to that point in time had you
23 ever worked with Mr. Block before?
24   A     Yes, I have.
25   Q     And how many times?

2 (Pages 2 - 5)

1    A    You are wrong.

2    Q    Okay.

3    A    The vast majority of patients who are
4  treated as adults never saw a puberty blocker in their life.

5    Q    Doctor Schechter described a situation
6  where patients have been on puberty blockers and wanted to have
7  a penectomy and a vaginalplasty when they became adults but
8  there wasn't enough penal tissue to do an inverted procedure.
9  That would have been a result of these puberty blockers and
10  cross-sex hormones, wouldn't it?

11    A    I would have to see more details about the
12  case.  Could be that that person genetically had a small penis.

13    Q    Sure.  Or --

14    A    It does happen.

15    Q    Or it could be from the puberty blockers
16  and cross-sex hormones.

17    A    I'd have to see the case.  In theory, it's
18  a possibility.  But I can't speak to that case.

19    Q    You never heard of that happening in the
20  field of medicine?

21    A    I've heard people talk about it.

22         MR. JOHNSON:  Okay.  Take a quick break.

23         (A recess was had.)

24  BY MR. JOHNSON:

25    Q    Doctor Brown, I want to hand you what's

1  been marked as Exhibit 41.

2    A    Okay.

3    Q    Have you seen that document before?

4    A    It's a 72-page document about -- Decision

5  Memo for Gender Dysphoria and Gender Reassignment Surgery dated

6  --

7    Q    At the bottom, August 30, 2016?

8    A    August 30, 2016.

9    Q    And you refer to that, I think, in your
10  supplemental declaration?

11    A    Yes.  It's been some time since I reviewed
12  the whole document.  But, yes, I have seen the document.

13    Q    Okay.  On page four of that document
14  there's a timeline of action.  Do you see that?

15    A    Yes.

16    Q    And we have bad lighting in here so I'm
17  going to try to read this as best I can.  It looks like CMS
18  posted a tracking sheet on the web inviting public comments on
19  their study of gender reassignment surgery?  Do you see that?

20    A    Yes.

21    Q    December 3 of 2015?

22    A    Yes.

23    Q    And they invited comments.  Were you aware
24  of that posting, and did you make any comments yourself?

25    A    I don't recall.

1    Q    That was kind of a compound question.  You
2  don't recall if you are aware of the posting?

3    A    Both.  I don't recall either.

4    Q    Okay.  And then --

5    A    These postings are not just readily
6  available.

7    Q    Okay.  I wasn't being critical.  I just
8  wanted to know what you know.

9    A    Yeah.  But, I mean, it could be that a
10  posting exists that people work in this field never even see it
11  because they don't go out of their way to make these things
12  available.

13    Q    And then on June 2, 2016, they issued a
14  proposed decision.  Invited comments.  Were you aware of the
15  issuance of that proposed decision?

16    A    I don't recall.

17    Q    You don't recall making any comments?

18    A    I don't recall.

19    Q    Okay.  And, then, as we just established,
20  the final decision came out August 30 of 2016, correct?

21    A    According to the first page of the
22  document, yes.

23    Q    So when did you first become aware of this
24  2016 memo decision?

25    A    Became aware of it sometime after 2016,

1  obviously.  And one of my colleagues, I believe, had been
2  involved in the process or some discussion about it.  And
3  brought it to my attention sometime thereafter after 2016.

4    Q    Still on the calendar year 2016 or --

5    A    I don't know.  I can't tell you that.  I
6  don't know.

7    Q    I'll let you get your tea here.  But who
8  was the colleague?

9    A    Doctor Ettner.

10    Q    Out of Chicago?

11    A    Yes.  Actually Evanston.

12    Q    You want to get your tea?

13    A    Yes.

14    Q    Doctor Ettner is a psychiatrist?

15    A    She is a psychologist.

16    Q    Psychologist.  Okay.

17         And what did she tell you about this
18  decision?

19    A    I don't recall the details of the
20  conversation because I have had many conversations with Dr.
21  Ettner.  And that she had in some way been involved in the
22  process or commented on it or had some input into it.  And
23  that's -- the conversation was part of a more general
24  conversation I was having with her, and this came up as one of
25  other topics.

10 (Pages 34 - 37)

1     Q     Had you read this decision before you

2 became involved in this case?

3     A     I believe I may have after the

4 conversation with her peaked my interest. And I may have looked

5 at it. I don't know if I read all 72 pages of the document.

6 But I think I may have looked it up and looked at it somewhere

7 after that conversation.

8     Q     And before you were hired on this case.

9     A     Correct.

10     Q     Did Dr. Ettner, before you became involved

11 in this case, ever express to you her opinion about this

12 decision? Was she critical of it?

13     A     You know, I frankly just can't remember

14 the content of the conversation.

15     Q     Did you before you became involved --

16     A     One of the things I do remember is

17 something that -- that her -- that she said something to the

18 effect that it was a complicated decision. It wasn't

19 straightforward. And that some of it was positive. Something

20 to that effect.

21     Q     Before you became involved in this case

22 did you form any criticism of this decision?

23     A     Well, after I looked at it and got into

24 what they're actually deciding on, what they said, I understood

25 what they were saying at the end of it. But it wasn't a focus.

1 My patients have veterans' healthcare. So, you know, it didn't

2 have the same direct impact on me as a clinician as it would for

3 somebody who's working with elderly; meaning 65 and older

4 patients. This decision has to do with Medicare. So it's

5 specific to a 65 and older population. With some exceptions for

6 people on Medicare or under 65.

7     Q     Well, that study relied on by the CMS were

8 not limited to Medicare eligible individuals, was it?

9     A     Therein lies one of the problems.

10     Q     I'm going to ask you to answer my

11 question. I know that the 2016 CMS decision talks about whether

12 or not it should be coverage for transgender individuals who are

13 on Medicare. But the studies they looked at in forming their

14 conclusions were not limited to transgender individuals who are

15 eligible for Medicare, isn't that true?

16     A     That's correct.

17     Q     All right.

18     A     Which is a problem.

19     Q     You answered my question.

20     (EXHIBIT 39 WAS FILED.)

21 BY MR. JOHNSON:

22     Q     I'm going to hand you what is marked as

23 Exhibit 39. That's a Department of Health and Human Services

24 decision in 1989 discussing whether or not there should be

25 Medicare coverage for transgender individuals, gender dysphoria

1 and who are on Medicare; is that right?

2     A     It's a 29 year old document that I have to

3 be quite frank, I have not looked at this document. So if you

4 would give me a moment to review it I could answer your

5 question. Okay.

6     Q     For the record, this document is much

7 larger than Exhibit 39 because it covers all kinds of

8 conditions. But as it relates to transsexual surgery, if you

9 turn to page 33, and you just read that page?

10     A     I read the section 35-61, transsexual

11 surgery.

12     Q     Okay. And the last paragraph there says,

13 "Transsexual surgery for sex reassignment of transsexuals is

14 controversial. Because of the lack of well-controlled long-term

15 studies of the safety and effectiveness of the surgical

16 procedures and attendant therapies for transsexualism, the

17 treatment is considered experimental. Moreover, there is a high

18 rate of serious complications of these surgical procedures. For

19 these reasons, transsexual surgery is not covered."

20     Did I read that correctly?

21     A     You read that correctly.

22     Q     So in 1989 the federal government

23 indicated they were not going to cover these surgeries, correct?

24     A     Yes. Twenty-nine years ago, that is true.

25     Q     I understand. We're going to get to the

1 2014 decision. That then brings us to the decision you want to

2 talk about, which is Exhibit No. 40.

3     A     Okay.

4     Q     You recognize that decision?

5     A     Yes. I haven't seen it in some time. But

6 I do recognize the document.

7     Q     Well, you attached it to one of your

8 declarations, did you not?

9     A     Yes. Months ago.

10     Q     If you find your first report, I think we

11 talked about it earlier there. What exhibit is that?

12     A     Forty-five.

13     Q     Thank you.

14     On page 11, paragraph 40, of your report.

15     A     The report dated March 2018.

16     Q     Yes.

17     A     Okay.

18     Q     Paragraph 40, you put, "As recently

19 summarized by WPATH's position statement on medical necessity of

20 treatment, sex reassignment and insurance coverage in the United

21 States, parentheses, attached as Exhibit H, decades of research

22 and research have demonstrated that transition-related care,

23 including cross-sex hormone therapy and surgery, is safe and

24 effective."

25     That's what you wrote, correct?

11 (Pages 38 - 41)

1   A   That is correct.
2   Q   And then you go on to say, "Based on this
3   robust body of research" -- that's the research you referenced
4   in the prior sentence?
5   A   Well, robust body of research including
6   that and things that have continued to come out.
7   Q   Okay.  Yeah.  I read that first sentence.
8   And then you go on to say, "Based on this robust body of
9   research, an independent medical board in the U.S. Department of
10  Health and Human Services issued a decision in 2014 rescinding a
11  Medicare policy that had excluded surgery from Medicare
12  coverage, parenthesis, attached as Exhibit I, close
13  parenthesis."
14      That's what you wrote?
15  A   Yes.
16  Q   And this 2014 decision overruled the 1989
17  decision, which we went over earlier, correct?
18  A   Yes.  Under the analysis on page seven, it
19  does say that.
20  Q   Right.
21      And then you went on to write, "The
22  decision" -- that would be the 2014 decision -- "explained that
23  the Medicare surgery exclusion for patients with a diagnosis now
24  known has gender dysphoria was based on a medical review
25  conducted in 1981 and failed to take into account subsequent

1   major developments in surgical techniques and medical research.
2   The board stated:  We have no difficulty concluding that the new
3   evidence which includes medical studies published in the more
4   than 32 years since issuance of the 1981 report underlying the
5   exclusion and demonstrates that transsexual surgery is
6   safe and effective and not experimental."
7       That's what you wrote, correct?
8   A   Correct.
9   Q   And therefor you cite this 2014 decision
10  in support of your opinions in this case.
11  A   Page seven specifically.
12  Q   Page seven of what?
13  A   Page seven of the decision --
14  Q   Sure.
15  A   -- of Exhibit No. 40 is essentially
16  quoting what is on page seven.
17  Q   Right.
18      And what you're saying is, in your first
19  report, these surgeries are safe and effective, not
20  experimental.  And then you cite the 2014 memo decision in
21  support of your opinions, correct?
22  A   Correct.  I have additional support, but
23  that is one piece of the support.
24  Q   I understand.
25      Now, how did you become aware of this 2014

1   decision, do you remember?
2   A   I have no idea.
3   Q   Okay.  Are you aware of the patient that
4   is the subject of that 2014 decision?
5   A   If I could hear the name I could tell you
6   the answer to that.  I don't know.
7   Q   Doctor Schechter, without disclosing a
8   name, indicated it was his patient.  Were you aware of that?
9   A   No, I wasn't.
10  Q   Okay.
11  A   And if it was one of Dr. Schechter's
12  patients, it probably is not somebody that I know.
13  Q   Now, your report, first one, is March 18,
14  2018, correct?
15  A   Correct.
16  Q   All right.  After you prepared that report
17  and sent it to Mr. Block you got a copy of the defendants'
18  answers to interrogatories in this case?
19  A   I believe so, yes.
20  Q   And you found in there a reference to the
21  2016 memo decision, did you not?
22  A   Without the document in front of me I
23  can't say yes or no.
24  Q   Okay.  Going to hand you what has been
25  marked as Exhibit No. 17.  I'd ask you to take a look at the

1   answer to interrogatory number one.
2   A   Answer.
3   Q   Yeah.  The first page -- the first page is
4   the question, which is the interrogatory, and below that is the
5   answer.
6   A   You had this thing over that.  I didn't
7   see it.
8   Q   You can move it.
9   A   Okay.  I have reviewed it.  I have not
10  read every word of this, but I have reviewed it.
11  Q   In that interrogatory answer the
12  defendants refer to the 2016 memo decision, do they not?
13  A   Yes.  Among other things.
14  Q   And before you filed your supplemental
15  report you talked to Mr. Block about these interrogatory
16  answers?
17  A   I don't know if I talked to him about them
18  or whether I just read them.  I can't tell.
19  Q   Well, didn't you and Mr. Block decide you
20  better do a supplemental opinion because the defendants in part
21  were relying on this 2016 memo decision?
22  A   I recall that I was asked to do a
23  supplemental report.  But I can't recall whether that was the
24  specific reason.
25  Q   So you recall being asked to prepare a

12 (Pages 42 - 45)

1 supplemental report but you don't recall that one of the reasons
2 was because of this 2016 memo decision.
3          MR. BLOCK:  Objection.
4 BY MR. JOHNSON:
5      Q     Is that right?
6      A     I don't know that that's right.
7      Q     You don't know one way or the other.
8      A     I don't recall having a conversation we
9 need to do a supplemental declaration based on anything to do
10 with the CMS report.
11      Q     And what was your understanding why you
12 did the supplemental report?
13      A     My understanding was because what I put in
14 the initial report was being responded to and that I needed to
15 add additional information that was not in my first report.
16      Q     Responded to by who?
17      A     I believe I received additional paperwork.
18      Q     You think those interrogatory answers were
19 in response to your original report?
20      A     I don't know if they're in response.  But
21 additional information between the filing of the first report
22 and filing the second report came out.  And, certainly, when I
23 had access to this and read it I had a number of substantial
24 disagreements with what was in this material that were not
25 addressed in my first report.

1      Q     Okay.  One of which is the 2016 memo
2 decision.
3          MR. BLOCK:  Objection.
4          THE WITNESS:  Well, one of which is the
5      very first sentence that a significant number of
6      members in the medical field have concluded that
7      gender transitions or transformations can be harmful
8      to the patient.  I disagree with that first sentence,
9      and then thereafter.
10 BY MR. JOHNSON:
11      Q     And you didn't talk about the 2016 memo
12 decision in your first report, did you, of May 18, 2018?
13      A     I may not have.
14      Q     This is the first time you brought it up
15 was in your supplemental report; isn't that correct?
16      A     I believe that's correct.
17      Q     I'm going to hand you what's been marked
18 Exhibit 47.  Do you recognize what that is?
19      A     Supplemental report -- looks like the one
20 that I wrote.
21          (EXHIBIT 47 WAS FILED.)
22 BY MR. JOHNSON:
23      Q     What's the date of that report?
24      A     Eight April '18.
25      Q     April 8 of '18?

1      A     Yes.
2      Q     On page one of Exhibit 47, paragraph two,
3 you write, "In my initial report I concluded:  There's no
4 dispute in the mainstream medical community that
5 transition-related care, including cross-sex hormone therapy and
6 gender confirmation surgery, treats an illness or condition, and
7 that such care meets accepted standards of medicine."
8          That's what you wrote?
9      A     Correct.
10      Q     And then over on page two, paragraph
11 three, you put, "In my original report, I also noted that I may
12 supplement these opinions in response to information produced by
13 defendants in discovery or in response to defendants' expert
14 disclosures.  I now provide this report to supplement that
15 expert opinion in response to defendants' answers to plaintiff's
16 first set of interrogatories, which is attached as Exhibit A."
17          So this supplemental report is designed to
18 respond to the defendants' first set of interrogatory answers,
19 isn't that correct?
20      A     Yes.
21      Q     On paragraph seven, page two, of your
22 supplemental report, which is number 47, you indicated, "As I
23 discussed in my original report, an impartial adjudicated board
24 in the Department of Health Human and Services concluded in
25 2014, based on decades of studies that surgical care to treat

1 gender dysphoria is safe, effective and not experimental.  The
2 decision specifically noted that regardless of whether the
3 studies were randomized double-blinded trials, there was
4 sufficient evidence to prove a consensus among researchers and
5 mainstream medical organizations that transsexual surgery is an
6 effective, safe and medically necessary treatment for gender
7 dysphoria."
8          What did you mean when you said the
9 decision specifically stated that -- noted that regardless of
10 whether the studies were randomized double-blinded trials?  As I
11 understand a double-blinded trial is the participant and
12 researcher don't know who's in the control group; is that right?
13      A     That's one of the characteristics of those
14 trials, yes.
15      Q     Of double-blinded.
16      A     Double-blinded trials.
17      Q     What other characteristics?
18      A     Well, I mean, it depends on whether you're
19 studying a drug or a procedure.  It could be a variety of other
20 conditions.  So it's dependent on the type of study.  But the
21 main characteristic of double-blind studies is that the person
22 doing the study, the clinician/researcher doing the study,
23 doesn't know what the intervention is that the patient is
24 getting.
25      Q     And they can -- your final report -- or

13 (Pages 46 - 49)

1     that those patients have been selected properly with
2     only a less than one percent regret rate reported in
3     the surgery.  No more than one point five percent,
4     depending on which research you look at.
5 BY MR. JOHNSON:
6     Q     Do you even remember what the question was
7 anymore?
8     A     Yes.  Patient selection.
9     Q     Yeah.  In 2016 the CMS board was concerned
10 about the inability to predict which patient was going to be
11 helped by the surgery and which one was not.  Isn't that true?
12          MR. BLOCK:  Objection.
13          MR. JOHNSON:  What's your objection?
14          MR. BLOCK:  That the reference is the
15     precise patient population, is the phrase used.  Not
16     the ability to know whether a particular patient
17     would benefit.
18 BY MR. JOHNSON:
19     Q     Well, isn't that what that means, doctor?
20 The 2016 CMS board was concerned that they could not identify
21 the precise patient population that could be helped by the
22 surgery or not.
23     A     The 2016 board was concerned whether
24 Medicare beneficiaries age 65 and over would be an appropriate
25 population for surgery.

1     Q     And whether or not you could with any
2 precision determine who would be helped by the surgery and who
3 wouldn't.
4     A     Over the age of 65.
5     Q     Once again, you keep saying over the age
6 of 65.
7     A     That's the context of the memo.
8     Q     But you already agreed with me earlier
9 that the studies CMS looked at were not restricted to
10 transgender Medicare-eligible individuals.  It was a complete
11 adult population, isn't that correct?
12     A     And I quickly followed up with "and that
13 was one of the problems."
14     Q     Okay.
15     A     These people are looking at over 65
16 elderly patients for which this statement is correct.
17     Q     I'm going to move to strike as
18 nonresponsive.
19          Now, to be truthful, sir, you didn't cite
20 the 2016 memo decision in your first declaration because it
21 didn't support your opinions, isn't that true?
22          MR. BLOCK:  Objection.
23          THE WITNESS:  No, that's not true.
24 BY MR. JOHNSON:
25     Q     You will agree with me you didn't cite it

1 in your declaration.
2     A     I agree that I did not cite it or many
3 other things that I could have cited in the first report.
4     Q     But what you did is you cited -- going
5 again back to paragraph 40 of your first report, which is
6 Exhibit --
7     A     Okay.
8     Q     What is the exhibit number?
9     A     Forty-five.
10     Q     You put, "Based on this robust body of
11 research, an independent medical board and the U.S. Department
12 of Health and Human Services issued a decision 2014 rescinding a
13 Medicare policy that had excluded surgery for Medicare
14 coverage."
15          Now, the 2016 decision concluded that
16 those studies were not robust, isn't that true?
17          MR. BLOCK:  Objection.
18          THE WITNESS:  What I said is robust body
19 of research.  I didn't say robust study.  That's a
20 difference.
21 BY MR. JOHNSON:
22     Q     Well, let's go back, then, to the first
23 sentence of that paragraph.  "As recently summarized by WPATH's
24 position statement on medical necessity of treatment, sex
25 reassignment and insurance coverage in the U.S.A., decades of

1 studies and research have demonstrated that transition-related
2 care, including cross-sex hormone therapy and surgery, is safe
3 and effective.  Based on this robust body of research, the
4 independent medical board in the U.S. Department of Health and
5 Human Services issued a decision in 2014."
6          Are you saying that the board in 2014 just
7 relied on this robust body of research and not the decades of
8 studies you referred to earlier?
9     A     I think that they relied on the things
10 that they said they relied on in the document.
11     Q     Which is studies and research, isn't it?
12     A     At the very least, they also probably
13 considered comments that people submitted.  Otherwise what's the
14 point of asking for comments?
15     Q     If you -- let me write that down.  That
16 2016 decision, what's the exhibit number, please?
17     A     Forty-one.
18     Q     Thank you.
19          If you look on the first page of 41, under
20 the decision summary?
21     A     Okay.
22     Q     The last paragraph?  It says, "While we're
23 not issuing a NCD, CMS encourages robust clinical studies that
24 will fill the evidence gaps and help inform which patients are
25 most likely to achieve improved health outcomes with gender

1 reassignment surgery, which types of surgery are most
2 appropriate and what types of physician criteria and care
3 settings are needed to ensure that patients achieve improved
4 health outcomes."
5        That was part of the decision summary of
6 the 2016 memo decision, correct?
7        A        Correct.
8        Q        And you didn't cite any of that language
9 in your first report, did you?
10       A        No.
11       Q        You just cited the 2014 decision.
12       A        Right.
13       Q        Do you think that the conclusions and
14 viewpoints of the CMS board in 2016 represents a fringe
15 viewpoint?
16                 MR. BLOCK:  Objection as to the term "CMS
17 board."  It's not the board.
18 BY MR. JOHNSON:
19       Q        Okay.  Do you believe that the 2016 CMS
20 decision represents a fringe viewpoint?
21       A        Are you speaking to something specific in
22 the 72 pages or the entire 72-page document?
23       Q        Well, you read that decision.  Do you
24 think that summary decision represents a fringe viewpoint?
25       A        I need you to focus more on what you're

1 asking me.  Because there's a lot of material here.
2        Q        Okay.  What I'm asking you is, and the
3 reason why is, you called the experts of the defendants
4 representing a fringe viewpoint.  And I'm asking you -- you've
5 read that decision --
6        A        I would argue that they're actually not
7 experts in this case.  But that's a different question.
8        Q        You understand the question, don't you?
9        A        No, I don't.
10       Q        Okay.  The question is, looking at that
11 2016 memo decision and reading the summary of it, do you think
12 that summary represents a fringe viewpoint?
13       A        No.  I don't believe it represents a
14 fringe viewpoint in that everybody says in all areas of medicine
15 it's the practice of medicine and we incrementally improve what
16 we do in all fields of medicine, including gender dysphoria, by
17 doing yet better and more studies going forward whether it's
18 bariatric surgery, whether it's psychiatry, whether it's gender
19 dysphoria.  So I would not take issue with any conclusion that
20 says filling evidence gaps.  There's evidence gaps in every area
21 of medicine we do.
22       Q        Okay.  Do you think that 2016 decision has
23 any value in the field of medicine?
24       A        I'm having trouble with the question.
25 Valuing -- value to who in what way?

1        Q        Value to you in your practice.  Value to
2 Dr. Schechter in his practice.
3        A        Well, it's pretty dated at this point.  I
4 mean, they're relying on things well before 2016.  So it has
5 some value maybe up to that point in time.  But obviously things
6 have proceeded and progressed since then.  There are a number of
7 big studies, including my own, that have come out since this
8 study.  Outcome studies that have come out since this study.  So
9 it's one snapshot in time.  So it's, at this point, almost a
10 historical document.
11       Q        August of 2016 is now a historical
12 document.
13       A        A rapidly evolving field.
14       Q        Was the 2014 document you cited in your
15 report a historical document?
16       A        Based on the dates, it's historical.
17 That's what you have to work with.
18       Q        And you cited it because it supported your
19 opinion, isn't that right?
20       A        I'm not saying I disagree with the opinion
21 that there are evidence gaps in the 2016 decision.
22       Q        You cited the 2014 decision in support of
23 your opinion.
24       A        Yes.
25       Q        And that document obviously is older than

1 the 2016 memo decision.
2        A        I can cite literature going back to 1997
3 that supports my opinion.
4        Q        And the 2014 decision is older than the
5 2016 memo decision, isn't it?
6        A        Chronologically, yes.
7        Q        And according to that 2016 memo decision,
8 that was issued on August 30, 2016, correct?
9        A        Yes.
10       Q        Are you saying that the CMS don't do a
11 thorough research of the studies and the research up to the date
12 of its decision?
13       A        I wasn't involved in that process so I
14 can't comment.
15       Q        Okay.  Any of your work that you're
16 referring to as studies you've done prior to August 30 of 2016?
17       A        Yes.
18       Q        Is it cited in there by the CMS in the
19 2016 decision?
20       A        I don't know.  I would be happy to look.
21       Q        Take a break, you can take a look.
22                 Don't you keep up on the literature in
23 your field?
24       A        I do keep up with the literature in my
25 field.  But if you're asking me if I know everything that's ever

16 (Pages 58 - 61)